

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:JAM/JGH
F.# 2020R00001

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 8, 2021

By ECF and Email

The Honorable William F. Kuntz
United States District Judge
United States District Court
Eastern District of New York
Brooklyn, New York 11201

      Re:    United States v. Joseph Miner
              Docket No. 20-CR-554 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for July 13, 2021. On January 13, 2021, the defendant pled guilty to possession of a defaced firearm, in violation of Title 18, United States Code, Section 922(k). The defendant's total offense level is 23, which provides for an advisory sentencing range per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") of 46-57 months. The defendant stipulated to this Guidelines calculation in a written plea agreement with the government. This is also the same range calculated by the Department of Probation in the Pre-Sentence Investigation Report ("PSR"). See PSR at ¶¶ 19-30.

      For the reasons set forth in the PSR and herein, the government respectfully requests that the Court impose a sentence of imprisonment at or near the top of the Guidelines range.

Offense Conduct

      The PSR accurately summarizes the offense conduct. See PSR at ¶¶ 3-13. As described in the PSR and herein, an investigation by agents from the Federal Bureau of Investigation ("FBI") and members of the Joint Terrorism Task Force ("JTTF") revealed that the defendant posted violent racist and anti-Semitic content on his social media accounts, sent and received messages about his desire to obtain assault weapons and other firearms, and

ultimately attempted to procure various firearms and peripherals, including the defaced firearms that led to his conviction.

I.  The Defendant

The defendant is a 30-year old citizen of the United States who was born in Queens, New York and currently resides with his parents in Bayside. See PSR at ¶¶ 3-29. He has no known criminal history. See PSR at ¶¶ 34-36. He is a high school graduate, completed some college coursework and has a certificate from West Coast Baptist College in Lancaster, California. See PSR at ¶¶ 55-57. He has held a variety of jobs, ranging from construction to chauffeur to canvasser for a political consulting company. See PSR at ¶¶ 3-13.

II. The Offense and Relevant Conduct

A.  The Defendant's Social Media Activity

As described in the PSR at ¶¶ 4-7, between December 2019 and January 2020, the defendant posted a variety of violent and racist content on his Instagram account, including:[1]

> • A photograph of himself giving a Nazi salute with the text: "God I hate women jews and niggers;"
>
> • A photograph of himself giving a Nazi salute, displaying a large knife with the text: "overthrowing [Jews] is our Christian duty;"
>
> • In response to a bloody crime scene photograph from the December 2019 machete attack at a synagogue in Monsey, New York, the comment, "ngl [not gonna lie] this is pretty fucking exciting;"
>
> • In response to a post lamenting the recent spate of anti-Semitic attacks in the greater New York City area, the comment "HIEL [sic] HITLER;"
>
> • A meme of a Planned Parenthood being blown up by the comic book character the Joker;
>
> • An article describing the arrest of a 26-year-old Israeli national for cashing a false check, with overlaid text that reads, "Jews must have a genetic devotion to the number six. 666, 6 million, etc;"

---

[1] Where the content of communications or documents are described, they are done so in pertinent part and in sum and substance, unless otherwise indicated by quotations.

2

• A photograph of the entrance to a Jewish Community Center in Queens.

The defendant also wrote messages in which he fantasized about "martyring" himself and "go[ing] out in a blaze of glory" in a mass shooting-type of attack. PSR at ¶ 5. For example, in a series of messages posted on November 4, 2019, Miner considered "go[ing] out firing. Go on a spree after my enemies til the authorities take me out...Sometimes I've considered forming a well-trained incel hit squad." Id. In another series of posts on January 3, 2020, Miner wrote, "I want to go out shooting the cops...take out a. Bunch [sic] of enemies and die shooting." Id. In a post on February 14, 2020, Miner wrote, "Tbh [to be honest] dying fighting Paki and African pieces of shit in Europe wouldn't be the worst way to go. Die a hero." Id.

The defendant also discussed obtaining assault weapons and other firearms. See PSR at ¶ 6. In a November 8, 2019 post, he wrote that he sought to do so for "boogaloo purposes," which is slang for a racial civil war in the United States. Id. In another series of posts on November 5, 2019, the defendant stated that he hoped for the onset of "RaHoWa," or racial holy war, and contemplated moving to Texas where he can "own [his] guns" without having to "beg police judge and detective for permission…Just for a pistol. Beg on your knees like a bitch." Id. On November 15, 2019, in an apparent reference to the August 2017 white supremacist rally in Charlottesville, Virginia, the defendant stated, "I'm pretty fearless at this point I yearn for the next Cville." Id.

In other messages and statements, the defendant minimized his propensity for violence, alternatively claiming that his need for weapons was for self-defense and stating, for example, that he disavowed terrorist attacks and that he was "so tame [he's] no real threat." PSR at ¶ 7. Nevertheless, on February 7, 2020, the defendant lamented, "[s]ome day, I will probably have to shed my blood or go to prison for the things I say and do and stand for." Id.

B. The Defendant's Attempts to Procure Military Equipment and Weapons

In the months during and after the defendant posted these violent and racist statements on his social media accounts, the defendant made efforts to obtain tactical military gear and firearms. On January 17, 2020, the defendant purchased body armor emblazoned with an iteration of the Wolfsangel, a Nazi party symbol that, most recently, has been adopted by the Azov Battalion, a Ukrainian militia group. See PSR at ¶ 8. The following month, in February 2020, the defendant called a pawnshop in Texas and inquired about purchasing assault weapons and a Mossberg shotgun. Id. Then, on March 30, 2020, the defendant purchased a tactical ballistic helmet and posted a photo of it on Instagram. Id.

C. The Defendant's Firearms Purchase

As described in the PSR at ¶¶ 9-13 and detailed in the complaint, 20-M-368, ECF Docket No. 1, in April 2020, the defendant was introduced to and had numerous communications with an undercover officer. In his text and voice communications with the undercover officer, the defendant used coded language, referring to the firearms he wished to

3

purchase as "tools" or "supplies." Id. The defendant also told the undercover officer that his neighborhood friend and co-defendant, Daniel Jou, was also interested in purchasing several weapons. Id.

On April 26, 2020, the defendant and Jou met with the undercover officer in the lobby of a hotel in Queens, New York. See PSR at ¶ 10. During this recorded meeting, the defendant stated that he was interested in purchasing two firearms, a Smith and Wesson Shield M2.0 nine-millimeter pistol and a Mossberg 500 shotgun. Id. Jou stated that he wanted to purchase three nine-millimeter semi-automatic pistols, namely, a Beretta M92FS, a Springfield 1911, and a Glock 19. Id. The defendant and Jou discussed pricing with the undercover officer, and both the defendant and Jou indicated that they had thousands of dollars in cash on hand and were ready to purchase the weapons that evening. Id. The undercover officer told the defendant and Jou that he did not presently have the firearms and that a second meeting, possibly the following weekend, was needed to finalize the purchase. Id. Both the defendant and Jou expressed interest in buying ammunition from the undercover officer, and the defendant indicated that he was interested in buying an assault rifle in the future when he had more money. Id. The undercover officer stated that he had several assault rifles available at a price point that the defendant could afford, including a "ghost" AR-15 [2] with a suppressor/silencer attached, as well as large-capacity magazines. Id.

At various times in the conversation, the undercover officer told the defendant and Jou that, given the illegal nature of the transaction, the "serial numbers" on the weapons had been "cleaned off." See PSR at ¶ 11. Despite claiming that he needed the weapons for "self-defense," the defendant suggested that further communications be conducted over an encrypted internet-based messaging platform and gave the undercover officer his username. Id. Jou also gave the undercover officer his username. Id. At the conclusion of the meeting, both the defendant and Jou reiterated that they were "eager" to buy, had the money, and were "ready today." Id.

On April 27, 2020, the defendant contacted the undercover officer via the encrypted messaging platform and confirmed that he wanted to purchase the firearms discussed at the previous meeting. See PSR at ¶ 12. Specifically, the defendant told the undercover officer to "bring the shield [nine-millimeter pistol], the mossy [shotgun] and that ghost with attachment [AR-15 with silencer] you mentioned, and maybe a few boxes of amm besides." Id. Jou also contacted the undercover officer via the encrypted platform and asked, "can we go over the list[?]" Id. Jou confirmed that he wanted the firearms discussed at the prior meeting, including "1911 nine-millimeter and glock 19 [and] M92 elite LLT/w trigger job & Opt. Performance Bar." Id. In subsequent messages, Jou asked about several other handguns, and asked the undercover officer "[w]hat is the nicest AR available," referring to an AR-15 assault rifle. Id. The defendant also asked the undercover officer for an additional

---

[2] A "ghost gun" is a firearm that has been assembled from different parts, none of which contain a serial number or identifying markings, thereby making them difficult for law enforcement to trace.

4

firearm, a "p 3 at," referring to a KelTec P3AT semi-automatic pistol. Id. The undercover officer again informed the defendant via text that the "serial numbers all cleaned off so they are clear (no trace) and good to go…I will have the ghost AR and some other long guns for u guys." Id. The undercover officer repeated a similar disclaimer to Jou, noting that the "serial" had been "cleaned off [the firearms] so no trace." Id.

On May 12, 2020, the defendant and Jou met the undercover officer and a second undercover officer at the same hotel in Queens to consummate the deal. See PSR at ¶ 13. The defendant purchased an AR-15-style ghost gun with a silencer, a Mossberg 500 shotgun, and an M&P "Shield" model nine-millimeter semi-automatic pistol. Id. The serial numbers on the shotgun and the pistol were obliterated. Id. Jou purchased a fully automatic Colt M4 assault rifle, which was also equipped with a silencer, and a Glock 19 nine-millimeter semi-automatic pistol with an obliterated serial number. Id. The defendant and Jou also purchased ammunition and high-capacity magazines for their respective assault weapons. Id.

### The Guilty Plea Proceeding and Guidelines Calculation

On May 12, 2020, both the defendant and Jou were arrested upon exiting the hotel room while in possessions of the weapons. At arraignment, upon motion of the government, the defendant was remanded without bail.

On January 13, 2021, the defendant pled guilty to an information charging one count of possessing a defaced firearm, in violation of Title 18, United States Code, Section 922(k). In a written plea agreement with the government, the defendant stipulated to the government's estimated Guidelines calculation, which is the same as delineated in the PSR at ¶¶ 19-30. As such the government submits that the Court should apply the Guidelines calculation set forth below:

| | | |
|---|---|---:|
| | Base Offense Level (§2K2.1(a)(4)(B)) | 20 |
| Plus: | Offense Involved 3-7 Firearms (§ 2K2.1(b)(1)(A)) | +2 |
| Plus: | Obliterated Serial Number (§ 2K2.1(b)(4)(B)) | +4 |
| | Acceptance of Responsibility (§ 3E1.1(a)-(b)) | -3 |
| | Total: | <u>23</u> |

As the defendant falls within Criminal History Category I, this offense level carries an advisory sentencing range of 46-57 months.

As part of his plea agreement, in addition to the standard conditions of supervised release, the defendant agreed to additional conditions of supervised release, including:

- abstain from the creation and/or use of social media accounts for a period of six months upon release;
- not associate with any individual known by him to be affiliated with any domestic terrorism-related groups, organized crime groups, gangs or any other criminal enterprise;
- participate in polygraph examinations required by the Probation Department to obtain information necessary for risk management and correctional treatment;
- cooperate with the Probation Department's Computer and Internet Monitoring program;
- random examinations of computer systems, Internet capable devices, and similar electronic devices under his control;
- report to the Probation Department any and all electronic communications accounts and passwords;
- permit the Probation Department to access and search any account using his credentials when reasonable suspicion exists that he has violated a condition of supervision and that the account to be searched contains evidence of this violation. The Probation Department may, in its discretion, share information obtained during such monitoring with law enforcement; and
- location monitoring for a period of 12 months.

## Sentencing Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Sentencing Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Argument

In this case, the Government respectfully submits that the Court should impose a sentence at or near the top of the 46-57 month Guidelines range because of, among other things, (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law, and (3) the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), (a)(6).

I.  The Defendant's Conduct Demands a Significant Incarceratory Sentence

The defendant pled guilty to a serious criminal offense, and circumstances surrounding the charges are even more so.

The defendant purchased a semi-automatic pistol with obliterated serial numbers, a shotgun and a "ghost" assault weapon with a silencer, and a high-capacity magazine with ammunition. The defendant's communications with undercover officers make clear that he was well aware that the serial numbers had been removed and the purpose for doing so: to anonymize the weapon, its illicit source and its end user. The Second Circuit has held that crimes involving the mere possession of firearms are inherently dangerous. United States v. Dillard, 214 F.3d 88, 96 (2d Cir. 2000). In Dillard, the Second Circuit observed that:

> Firearms are instruments designed for the use of violent physical force, whether legal or illegal. Apart from use for target practice in sport, firearms have no functional utility other than to threaten or cause harm to persons, animals, or property… [F]irearms are conventionally regarded as essential equipment of criminals engaged in violent crime.

214 F.3d at 93. Dillard also recognized that silencers are "conventionally regarded as…equipment of criminals engaged in violent crime." Id. As such, the defendant's interest in purchasing a silencer reflected his desire to use the weapons without being detected. United States v. Dodge, 846 F. Supp. 181 (D. Conn 1994) (noting that a silencer is "inherently dangerous…for which no peaceful purpose can be seriously suggested, regardless of whether the weapons actually are used" and citing United States v. Ballantine, 4 F.3d 504, 507 (7th Cir. 1993) and United States v. Horodner, 993 F.2d 191, 193 (9th Cir. 1993)). Similarly, a firearm with an obliterated serial number serves no purpose other than "to mask the identity of [the] weapon." United States v. Sands, 948 F.3d 709, 712 (6th Cir. 2020). While there is no federal statute that outlaws or provides enhanced penalties for privately manufactured "ghost guns," courts have recognized that such "untraceable" weapons warrant special consideration at sentencing. See United States v. Kamali, 834 Fed.Appx. 644 (2d Cir. 2020) (sale of multiple "ghost guns" was a factor to be considered at sentencing); United States v. Trujillo, 817 Fed.Appx. 634, 636 (10th Cir. 2020) (defendant who sold illegal firearms noted to undercover agents that the "best part" about "ghost guns" was "their lack of serial numbers."); United States v. McSwain, 2019 WL 1598033 (D.D.C. 2019) (slip opinion) (noting "concern" about

possession of a "ghost gun").  Thus, Miner's acquisition of these items – standing alone – requires a substantial jail sentence.

Any argument that the defendant ostensibly sought these weapons solely for "self-defense" is belied by the number and nature of the weapons he purchased, as well as the context in which he purchased them.  As described in the complaint, Miner actively and repeatedly solicited the undercover officer – whom he believed to be an illegal firearms trafficker – to purchase these weapons, rather than acquiring them through lawful channels.  Relatedly, it defies common sense why Miner would need multiple firearms, one being an untraceable "ghost" assault weapon with a silencer, for defensive purposes.  See United States v. Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *2 (D.P.R. 2005) (following Dillard and finding that, "[a] conglomerate of such illegal lethal weapons and paraphernalia can only suggest that their possessor (the defendant) intended to use them, along with other persons, to commit a dangerous and deadly act…[s]imply put, this Court cannot fathom any legitimate, non-violent use for these weapons.").  The fact that Miner readily attempted to assist another individual – his co-defendant – in acquiring a similar stockpile of weapons and ammunition is a further aggravating factor militating towards a significant jail sentence.

II.  The Need for Specific and General Deterrence Is High

A lengthy sentence is necessary to deter the defendant, and others like him, from committing future crimes.

The defendant's offense conduct involved considerable planning and thus requires a sentence that acts as a strong general deterrent.  See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("crimes [that] are more rational, cool, and calculated than sudden crimes of passion or opportunity…are prime candidates for general deterrence") (internal quotation omitted).  As with all crimes involving premeditation, a heavy sentence is necessary to deter others that might consider similar conduct.

Yet the deterrence factor is even more acute in this context.  Specifically, a substantial sentence in this case would send an appropriate and much-needed message to all persons harboring any notion that acquiring and using illegal weapons is not worth the risk.  Strong punishment for the defendant's inexcusable conduct sends the appropriate message to others – attempting to pursue these types of weapons will be prosecuted aggressively, and those who violate the law in this manner will be convicted and punished accordingly.  Recent events have demonstrated the enormous toll in loss of life that gun violence – whether in the context of gang violence or domestic terrorism – creates in communities across the country.  The Sentencing Guidelines capture this understanding and send the appropriate message to the public.

Beyond merely fashioning an appropriate general deterrent, the Court's sentence must deter the defendant himself.  As described herein, the evidence uncovered during the investigation has revealed that Miner has embraced an extremely violent ideology and contemplated committing acts of terrorism.  In his own social media postings, he glorified

acts of murder and terrorism against racial, ethnic and religious groups. More ominously, he ruminated about engaging in such violent conduct himself. While the government is not aware of evidence that Miner was actively planning any attack or other criminal plot, the fact that he purchased body armor and a tactical helmet prior to the instant offense conduct necessarily militate in favor of a significant sentence. There are also strong indications that Miner's extremist views have not abated since his arrest in this case. Specifically, communications between the defendant and third parties during the defendant's incarceration regularly feature racist and inflammatory sentiments which, while in and of themselves he has the right to hold and express, are nevertheless troubling because of his prior linking of similar extremist views with praise and ideations of violent acts, which were then followed by his purchase of three firearms in May 2020.

It should be noted that the defendant, in advance of sentencing, agreed to undergo an extensive psychiatric examination, conducted by Dr. Kostas A. Katsavdakis. This examination included the Terrorist Radicalization Assessment Protocol – 18 ("TRAP-18"). A copy of the forensic evaluation report ("the Report") has been provided to defense counsel and will be provided to the Court as an addendum to the instant submission. Based on the overall TRAP-18 assessment, the defendant "currently poses a low risk for terrorist targeted violence." In support of this conclusion, the Report noted that the defendant "did not take on the full appearance of a warrior, pseudo commando…beyond referencing Nazi symbols and the extremist group, Azov Battalion. He made no attempt to affiliate with such extremist groups nor failed to affiliate with such groups…His paranoid projections and externalizing blame about being victimized by the United States led to violent ideation and criminal behavior to purchase weapons, however, there appeared to be no specific targets or probing/planning of an actual attack." Forensic Evaluation Report, pp.13-14. Additionally, the defendant's willingness to consent to a variety of additional and restrictive supervision conditions reflects an acknowledgment of his own wrongdoing and will allow the government to monitor and address any propensity towards violence following the defendant's release from his custodial term. Nevertheless, both specific and general deterrence favor a significant sentence.

III.     Nothing in the Defendant's Background Provides Significant Mitigation

The circumstances of the defendant's upbringing and psychiatric history do not weigh in favor of a below-Guideline sentence. PSR ¶¶ 79-95; See United States v. Vera Ramos, 296 Fed. Appx. 201, 203 (2d Cir. 2008) (affirming guideline sentence despite defendant's "difficult upbringing" and noting district court's observation that such circumstances are "almost universal" among defendants). Even considering the instant criminal conduct in the context of undiagnosed or untreated mental illness, the defendant's refusal to seek and follow prescribed treatment has been entirely volitional. See Forensic Evaluation Report, p. 13 (noting that the defendant "demonstrated minimal follow up and poor compliance" and a "historical pattern of poor compliance with treatment.").[3]

---

[3]     Notably, the defendant's twin brother, Ashford Miner, has a pending prosecution for witness tampering in the Eastern District of Texas before the Honorable Amos

9

As stated by Dr. Katsavdakis, the defendant will require "extensive supervision…he will need to be stabilized via medication, monitored closely to ensure compliance…[w]ithout the proper medication, his racing thoughts, irritability, volatility and circumstantial thinking will increase in severity leading to impulsive and reckless behavior." See Forensic Evaluation Report, p. 14. As such, far from providing mitigation, the defendant's characteristics and background require a significant jail sentence, followed by strict conditions of supervision.

<u>Proposed Redactions to the Defendant's Submission</u>

On July 6, 2021, the defendant moved this Court to seal his sentencing submission (the "Defendant's Motion" and "Defendant's Submission," respectively). Specifically, the defendant argues that sealing is justified to protect confidential informant "material provided to [defense] counsel pursuant to Protective Order…[defendant's] mental health diagnoses and treatment…and sensitive family material and photographs." In subsequent discussions and having reviewed the applicable caselaw, the defendant and the government have agreed that the Defendant's Submission should be filed publicly with the following exceptions: Forensic Evaluation Report (Exhibit B), The Reentry Plan (Exhibit C), photographs attached to letters in support of the defendant, and Section I(B) of the Defendant's Submission should be redacted. Additionally, to the extent that any of the information contained in the Defendant's Submission implicates the confidential informant and is arguably subject to the Court's protective order, the parties jointly move the Court to allow it to be used publicly in the Defendant's Submission as currently written.

In support of this application, the government recognizes that, given the First Amendment right of public access to judicial documents, the ability to redact certain types of information in public filings is limited. <u>See</u>, <u>e.g.</u>, <u>United States v. Huntley</u>, 943 F. Supp. 2d 383, 385 (E.D.N.Y. 2013) (ordering unsealing of the defendant's sentencing memorandum); <u>United States v. King</u>, No. 10 Cr. 122 (JGK), 2012 WL 2196674, at *1 (S.D.N.Y. June 15, 2012) (redacting the medical information of defendant's family members but refusing to seal the defendant's own medical records); <u>United States v. Dare</u>, 568 F. Supp. 2d 242, 244 (N.D.N.Y. 2008) (refusing to redact the defendant's medical records, despite his strong privacy interest in these records, because he had "chosen to introduce the medical information in an attempt to mitigate his sentence"); <u>United States v. Sattar</u>, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006) (ordering unsealing of redacted copies of a psychiatric report submitted by defendant's counsel in support of sentencing memorandum, as well as counsel's cover letter).

---

L. Mazzant, III, 21-CR-10 (ALM). See PSR at ¶ 40. On May 19, 2021, Ashford Miner pleaded guilty to one count of witness tampering in violation of Title 18, United States Code, Section 1512(d)(1). In that case, Ashford Miner made threatening statements to an individual he believed to be responsible for the defendant's arrest and prosecution. The government has no evidence to suggest that the defendant played any role in Ashford Miner's charged conduct.

Thus, in order to seal documents to which the presumption of a right of public access attaches, a district court must make "'specific, on the record findings…demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119–20 (2d Cir. 2006) (quoting In re New York Times Co., 828 F.2d 110, 116 (2d Cir. 1987)). But "[w]here possible, limited redaction instead of wholesale sealing of court documents should be considered in order to adequately safeguard First Amendment values." Huntley, 943 F. Supp. 2d at 386 (citing Esposito v. New York Times Co., 485 U.S. 977 (1988); In re New York Times Co., 828 F.2d at 116). And even these redactions must be narrowly tailored to overcome the First Amendment right of access: "any claimed exception to the right of access should be based on a particularized showing of need, and any redactions would be required to be narrowly tailored to accomplish the overriding interest." King, 2012 WL 2196674, at *2 (citing Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13–14 (1986); Lugosch, 435 F.3d at 120).

While sealing the Defendant's Submission in its entirety would be improper, the parties submit that the proposed redactions strike the appropriate balance between the qualified right of public access and the privacy interests of the defendant and third parties. See Sattar, 471 F. Supp. 2d at 388 (defendant information redacted due to its a highly personal nature and its release "would not promote any of the values associated with public scrutiny of the sentencing process."); see also United States v. Roeder, No. 05-CR-6161L, 2009 WL 385448, at * 2 (W.D.N.Y 2009) (sealing letters from the defendant's psychotherapist and psychiatrist); United States v. Gotti, 17-CR-127 (ARR), 2017 WL 5027990 (E.D.N.Y. 2017) (allowing limited redaction of defendant's medical information where "it would be difficult, if not impossible" to protect a third party's medical information without doing so.").

## Conclusion

In this case, a sentence at or near the top of the Guidelines range of 46-57 months' imprisonment appropriately captures the defendant's egregious conduct, mitigates any danger he presents to the community, and provides a powerful deterrent message. The government respectfully submits that such a sentence would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a). The government further requests that the additional conditions of supervision delineated in the plea agreement be ordered upon the defendant's release from his term of imprisonment.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:    /s/
Artie McConnell
Josh Hafetz
Assistant U.S. Attorneys
Eastern District of New York
718-254-7000

cc: Benjamin Silverman, Esq. (by ECF and E-mail)
Jamie Turton, United States Probation Officer (by E-mail)