UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

   v.            **MEMORANDUM & ORDER**
                20-CR-00554 (WFK)
JOSEPH MINER,

      Defendant.
------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**

Joseph Miner ("Defendant") pled guilty to Possession of a Defaced Firearm in violation of 18 U.S.C. §922(k)—pursuant to a written plea agreement. ECF Nos. 29–31. The Court now sentences him and provides a complete statement of reasons, pursuant to 18 U.S.C. § 3553(c)(2), of those factors set forth by Congress contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is sentenced to 57 months of imprisonment to be followed by 3 years of supervised release with special conditions, and a $100 special assessment.

## BACKGROUND

On May 13, 2020, the United States filed a criminal complaint against Joseph Miner ("Defendant"), alleging one count of Possession of a Defaced Firearm in violation of 18 U.S.C. §922(k). On January 22, 2021, Defendant waived indictment and pled guilty to a criminal information charging him with the same count of Possession of a Defaced Firearm. ECF Nos. 29–31. The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

**I. Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for

the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]" *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

## II. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### a. Family and Personal Background

Defendant was born and raised in an intact family setting with his twin brother and his parents, the latter of which continue to live and work in Queens. ECF No. 32, ¶ 38–39. His brother resides in Denton, Texas and is currently facing prosecution for two counts of witness tampering in the Eastern District of Texas. *Id.* ¶ 40. Additionally, Defendant has four adult paternal half-siblings. *Id.* ¶ 41. Defendant reported an unremarkable childhood, free from any abuse. *Id.* ¶ 42. Defendant himself has never married or father children but has a good relationship with his fiance, who lives in Virginia. *Id.* 43–45.

2

Defendant is in good physical health but experienced feelings of depression as a teenager and was diagnosed with manic depression and bipolar disorder at the age of twenty. *Id.* ¶ 50–51. Initially, Defendant received mental health counseling at Pride of Judea in Queens for one year and took prescription medication to treat his depression and bipolar disorder. *Id.* However, in 2012, he ceased medical treatment and opted instead to rely on spiritual counseling and prayer to manage his symptoms. *Id.* Defendant has recently begun taking a common atypical antipsychotic medication and defense counsel notes that Defendant has recommitted to psychiatric medication. ECF No. 39-1 at 4.

Defendant has a history of substance abuse. He reported regular use of marijuana for several years until his arrest; intermittent cocaine use; and the use of hallucinogens, such as mushrooms and salvia. ECF No. 32 ¶ 52. Additionally, Defendant has a history of binge drinking, beginning in college until the instant offense, and was arrested and charged with driving while intoxicated in 2019. *Id.* ¶ 52. In 2014, Defendant completed a nine- or ten-month inpatient drug treatment program in Illinois and requested additional drug treatment counseling during his presentence interview. *Id.* ¶ 53–54.

Defendant's highest levels of education include attending Queens College for two years and earning a one-year bible certificate from West Coast Baptist College in California. *Id.* ¶ 55–56. He previously graduated from Benjamin Cardozo High School in Queens. *Id.* ¶ 57. Defendant most recently worked as a counterperson at a delicatessen, but has also held jobs as a canvasser, real estate salesman, a chauffeur, roofing helper, driver, cleaner, and laborer for seven different employers over a five-year period. *Id.* 58–65. Defendant failed to file personal income tax returns in 2017, 2018, and 2019. *Id.* ¶ 66.

      b.    <u>Defendant's History of Racist, Anti-Semitic Behavior</u>

Since at least 2019, Defendant has publicly engaged in abhorrent behavior, including making the following social media posts:

- A photograph of himself giving a Nazi salute with the text: "God I hate women jews and niggers;"

- A photograph of himself giving a Nazi salute, displaying a large knife with the text: "overthrowing [Jews] is our Christian duty;"

- In response to a bloody crime scene photograph from the December 2019 machete attack at a synagogue in Monsey, New York, the comment, "ngl [not gonna lie] this is pretty fucking exciting;"

- In response to a post lamenting the recent spate of anti-Semitic attacks in the greater New York City area, the comment "HIEL [sic] HITLER;"

- A photograph of a Planned Parenthood being blown up by the comic book character the Joker; and

- An article describing the arrest of a 26-year old Israeli national for cashing a false check, with overlaid text that reads, "Jews must have a genetic devotion to the number six. 666, 6 million, etc." *Id.* ¶ 4.

Defendant further glorified and fantasized about mass-shooting attacks. He posted about "martyring" himself and "go[ing] out in a blaze of glory" and publicly considered "go[ing] out firing. Go on a spree after my enemies til the authorities take me out . . . Sometimes I've considered forming a well-trained incel hit squad." *Id.* ¶ 5. In another series of posts on January 3, 2020, Miner wrote, "I want to go out shooting the cops . . . take out a. Bunch [sic] of enemies and die shooting." *Id.* In a post on February 14, 2020, Miner wrote, "Tbh [to be honest] dying fighting Paki and African pieces of shit in Europe wouldn't be the worst way to go. Die a

4

hero." *Id.*

Defendant attempted to acquire serious weaponry to further his white nationalist ambitions. In November 2019, he posted about acquiring weapons for "boogaloo purposes," which is slang for a racial civil war in the United States, and later discussed his hopes for the onset of "RaHoWa," or racial holy war, while contemplating a move to Texas where he can "own [his] guns" without having to "beg police judge and detective for permission . . . Just for a pistol. Beg on your knees like a bitch." In yet another November 2019 post—and in an apparent reference to the August 2017 white supremacist rally in Charlottesville, Virginia, where a young woman, peacefully present, was killed—Defendant boasted: "I'm pretty fearless at this point I yearn for the next Cville." *Id.* ¶ 6.

While in some statements, Defendant minimized his propensity for violence—for instance, by claiming that his need for weapons was for self-defense and claiming that he is "so tame [he's] no real threat," he at other times nevertheless lamented, "[s]ome day, I will probably have to shed my blood or go to prison for the things I say and do and stand for." *Id.* ¶ 7. Even more revealing were Defendant's attempts to obtain tactical military gear and firearms leading up the instant offense. For instance:

- In January, 2020, Defendant purchased body armor emblazoned with an iteration of the Wolfsangel, a Nazi party symbol that, most recently, has been adopted by the Azov Battalion, a Ukrainian militia group;

- In February 2020, Defendant called a pawnshop in Texas and inquired about purchasing assault weapons and a Mossberg shotgun; and

- In March 30, 2020, Defendant purchased a tactical ballistic helmet and posted a photo of it on Instagram. *Id.* ¶ 8

5

c.  Legal History, Nature of Offense

In April of 2020 Defendant began communications with an undercover officer, seeking to buy two firearms, a Smith and Wesson Shield M2.0 nine-millimeter pistol and a Mossberg 500 shotgun, along with ammunition. *Id.* 10. Defendant further expressed interest in buying an assault rifle when he had more money in the future. Defendant suggested to the undercover officer that further communication occur over encrypted messaging platforms and expressed interested in defaced weapons, i.e. weapons without serial numbers or other identifying marks. *Id.* 10–11.

On April 27, 2020, Defendant contacted the undercover officer via the encrypted messaging platform and confirmed that he wanted to purchase the firearms they had previously discussed. *Id.* ¶ 12. Specifically, Defendant told the undercover officer to "bring the shield [nine-millimeter pistol], the mossy [shotgun] and that ghost with attachment [AR-15 with silencer] you mentioned, and maybe a few boxes of amm besides." *Id.* Defendant also asked the undercover officer for an additional firearm, a "p 3 at," referring to a KelTec P3AT semi-automatic pistol. *Id.* The undercover officer again informed Defendant via text that the "serial numbers all cleaned off so they are clear (no trace) and good to go . . . I will have the ghost AR and some other long guns for u guys." *Id.*

On May 12, 2020, Defendant met two undercover officers at a hotel in Queens, New York to consummate the deal. *Id.* ¶ 13. There, Defendant purchased an AR-15-style ghost gun with a silencer, a Mossberg 500 shotgun with an obliterated serial number, and a M&P "Shield" nine millimeter semi-automatic pistol with an obliterated serial number. *Id.* Defendant was arrested that same day and has been in custody since. *Id.* ¶ 14.

B.  **The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The instant sentence adequately punishes the Defendant for his crime and provides both general and specific deterrence. Furthermore, a period of incarceration will protect the public from Defendant's inclination towards violent, racist, and anti-Semitic behavior. Through both incarceration and a period of supervised release, Defendant will have an opportunity to rehabilitate and reintegrate into society.

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

On January 22, 2021, Defendant waived indictment and pled guilty to a criminal information charging him Possession of a Defaced Firearm in violation of 18 U.S.C. §922(k). ECF Nos. 29–31.

Defendant faces a maximum term of 5 years of imprisonment. 18 U.S.C. § 922(k) and 18 U.S.C. § 924(a)(1)(B). Additionally, the Court may impose a term of supervised release of not more than 3 years, 18 U.S.C. § 3583(b)(2); a maximum fine of $250,00.00, 18 U.S.C. §3571(b); and a mandatory special assessment of $100.00, 18 U.S.C. § 3013. Defendant may be required to pay the costs of prosecution, United States Sentencing Guidelines ("USSG") § 5E1.5.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's

**Offenses**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

    a.   <u>The Guidelines recommend a sentence between 46 and 57 months' custody</u>

The Guideline for 18 U.S.C. § 922(k) offenses is Section 2K2.1. Since the offense involved a semiautomatic firearm capable of accepting a large capacity magazine, the base offense level is 20. USSG § 2K2.1(a)(4)(b)(i)(i). The offense is enhanced two levels if it involves between three and seven firearms. USSG § 2k2.1(b)(1)(a). Because the instant offense involves three firearms, this two-level enhancement applies. Furthermore, a four-level enhancement is warranted because defendant purchased two firearms with obliterated serial numbers. USSG § 2K2.1(b)(4)(b).

Defendant has demonstrated acceptance of responsibility for the offense by entering a plea of guilty and notifying the government in a timely manner of his intention to plead guilty. Accordingly, a three-level reduction applies. USSG § 3e1.1(a)–(b). This calculation results in a total offense level of 23.

The parties all agree on this calculation and further agree that Defendant has a criminal history category of one (1). An adjusted offense level calculation of twenty-three (23), with a criminal history category of one (I), yields a guidelines imprisonment range of 46 months to 57 months.

    b.   <u>The parties' recommendations</u>

The parties have provided divergent recommendations to the Court, based upon the Guideline sentencing range. Defense counsel recommends a below guidelines sentence of 30

months' in prison. Probation recommends a sentence of 57 months of imprisonment. The Government recommends a sentence at or near the top of the guidelines range.

   c. <u>Defendant consented to criminal forfeiture in the plea agreement</u>

Furthermore, as outlined in paragraph 6 of the plea agreement, Defendant consents to the forfeiture of the following: (i) an AR-15 style assault weapon and silencer; (ii) a Mossberg 500 shotgun with an obliterated serial number; (iii) an M&P "shield" nine millimeter semi-automatic pistol with an obliterated serial number; (iv) a fully-automatic Colt M4 assault rifle and silencer; (v) a Glock model 19 nine millimeter semi-automatic pistol with an obliterated serial number; (vi) two high-capacity magazines and ammunition; and (vii) $2,000 in cash, all of which was seized on May 12, 2020. *See* ECF No. 31.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor, requiring the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission," 18 U.S.C. § 3553(a)(5), is not pertinent to Defendant's sentencing.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). This factor is not relevant to

Defendant's sentence.

## CONCLUSION

The Great American Poet Maya Angelou captured the essence of Defendant's case when she wrote, "When someone shows you who they are, believe them, the first time." Defendant has shown this Court not only who he is but, more importantly, what he is: a racist, anti-Semitic, misogynistic, gun-buying, criminal. A man whose actions, but for the skilled intervention of law enforcement officers, presented a clear and present danger to the American Republic. Like the author of MEIN KAMPF—whom the Defendant so admires—he has revealed himself to be a full-blown Nazi. This Judge does not need to see the Second Edition of that work pursued here in the Eastern District of New York; not in my Court, not on my watch, not in my country. Never Again.

Therefore, the Court finds a sentence of 57 months of imprisonment to be followed by 3 years of supervised release with special conditions, and a $100 special assessment is appropriate and comports with the dictates of § 3553. This sentence is consistent with and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court expressly adopts the factual findings of the Presentence Investigation Report, barring any errors contained therein.

**SO ORDERED.**

                                                  s/ WFK
                                        HON. WILLIAM F. KUNTZ, II
                                        UNITED STATES DISTRICT JUDGE

Dated: July 13, 2021
      Brooklyn, New York