1

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - -    X

4    UNITED STATES OF AMERICA,    :    20-CR-554(WFK)

5           Plaintiff,            :
                                       United States Courthouse
6       -against-                 :    Brooklyn, New York

7    JOSEPH MINER,                :
                                       July 13, 2021
8           Defendant.           :    12:00 o'clock p.m.

9    - - - - - - - - - - - -    X

10
                    TRANSCRIPT OF SENTENCING
11       BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
              UNITED STATES DISTRICT JUDGE.
12

13   APPEARANCES:

14
     For the Government:        JACQUELYN M. KASULIS
15                              Acting United States Attorney
                                BY: ARTIE McCONNELL
16                                  JOSHUA G. HAFETZ
                                Assistant United States Attorneys
17                              271 Cadman Plaza East
                                Brooklyn, New York
18

19   For the Defendant:        BENJAMIN SILVERMAN, ESQ.
                                224 West 30th Street, Suite 302
20                              New York, New York  10001

21
     Court Reporter:           Charleane M. Heading
22                             225 Cadman Plaza East
                               Brooklyn, New York
23                             (718) 613-2643

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

CMH        OCR        RMR        CRR        FCRR

2

1          THE CLERK:  Criminal cause for sentencing, docket

2   number 20-CR-00554, United States of America versus Joseph

3   Miner.

4          Would each counsel please identify themselves and

5   state the names of their respective clients for the record

6   beginning with the government?

7          MR. McCONNELL:  Your Honor, good afternoon.  Artie

8   McConnell and Joshua Hafetz for the United States.  I'm joined

9   by Jamie Turton for the Department of Probation.

10          THE COURT:  Good afternoon.  You may be seated.

11          Ladies and gentlemen of the public, you may be

12   seated as well.

13          MR. SILVERMAN:  Good afternoon, Your Honor.

14   Benjamin Silverman for Joseph Miner who is seated to my right.

15          THE COURT:  Good afternoon.  You may be seated as

16   well, gentlemen.

17          Those of you in the well who have been fully

18   vaccinated, under the court rules, you may remove your mask.

19   If you have not been fully vaccinated, please continue to have

20   your masks up pursuant to our court rules.

21          We are here today on the case United States of

22   America against Joseph Miner, 20-CR-554.

23          Mr. Miner, have you had an opportunity to review

24   carefully and have you, in fact, reviewed carefully your

25   presentence investigation report filed on April 13, 2021 and

3

1  amended on May 28, 2021 and July 7, 2021?

2        THE DEFENDANT:  Yes, Your Honor.

3        THE COURT:  I can't hear you.

4        THE DEFENDANT:  Yes, Your Honor.

5        THE COURT:  Have you, in fact, reviewed those with

6  your counsel?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  Still can't hear you.

9        Have you reviewed those items with your counsel,

10  sir?

11        THE DEFENDANT:  Yes, sir.  Yes, sir.

12        THE COURT:  Is the mic on?

13        MR. SILVERMAN:  It appears to be on, Your Honor.

14  The light is on.

15        THE COURT:  Mr. Miner, have you been fully

16  vaccinated?

17        THE DEFENDANT:  I have not.

18        THE COURT:  Well, just keep your voice up when you

19  respond.

20        Have you also had an opportunity to review and have

21  you, in fact, read the following items.

22        Probation's sentencing recommendation filed

23  April 13, 2021?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  Now I can hear you fine.

4

1      The defense counsel sentencing memorandum filed

2 July 6, 2021?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  The government's sentencing memorandum

5 filed July 8, 2021?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  In addition to those materials, I have

8 the following in my files:  The criminal information filed on

9 January 22, 2021, waiver of indictment filed January 22, 2021,

10 plea agreement filed January 22, 2021, and letters filed in

11 support of the defendant.

12      Are there any other documents either counsel would

13 like to call to the Court's attention at this time beginning

14 with the government and Probation?

15           MR. McCONNELL:  No --

16           THE COURT:  You can remain seated, sir.  Just use

17 the microphone.

18           MR. McCONNELL:  No, Your Honor, other than the

19 addenda to defense counsel's submission.  That's all.

20           THE COURT:  The one that came in from Mr. Adam

21 Walton at the end of last week, that letter?  Is that what

22 you're talking about or something else?

23           MR. McCONNELL:  Yes.  Yes.

24           THE COURT:  Probation, anything else?

25           THE PROBATION OFFICER:  No, Your Honor.

5

1          THE COURT:  From the defense, anything else?

2          MR. SILVERMAN:  No, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          Now, Mr. Miner, do you feel prepared to go forward

5    with your sentencing today, sir?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Mr. Miner, you have the right to address

8    the Court before I pronounce sentence.  I will give you the

9    opportunity to do so in just a few minutes and you should feel

10   free to say anything you feel appropriate at that time before

11   I finalize my judgment in this case.  Do you understand, sir?

12         THE DEFENDANT:  I do.

13         THE COURT:  Mr. Miner, sir, are you satisfied with

14   your counsel's representation?

15         THE DEFENDANT:  Very much so, Your Honor.

16         THE COURT:  Have you received the effective

17   assistance of counsel in your view, sir?

18         THE DEFENDANT:  I have indeed, Your Honor.

19         THE COURT:  If you do not believe you've received

20   the effective assistance of counsel, you may raise as a matter

21   of law a claim of ineffective assistance of counsel at an

22   appropriate time and in an appropriate forum.  Do you

23   understand, sir?

24         THE DEFENDANT:  I understand, Your Honor.

25         THE COURT:  Now, the United States Code sets forth

1    the following parameters for a violation of one count of

2    possession of a defaced firearm in violation of Title 18 of

3    the United States Code, Section 922(k):  A statutory maximum

4    imprisonment term of five years; a statutory maximum

5    supervised release term of three years; a maximum fine of

6    $250,000; a mandatory special assessment of $100 which I am

7    required to impose per count on individuals in all cases.

8          Additionally, as set forth in paragraph 6 of the

9    plea agreement which you signed, you have consented to the

10   forfeiture of the following items:  One, an AR-15 style

11   assault weapon and silencer; two, a Mossberg 500 shotgun with

12   an obliterated serial number; three, an M&P Shield

13   9 millimeter semi-automatic pistol with an obliterated serial

14   number; four, a fully automatic Colt M4 assault rifle and

15   silencer; five, a Glock Model 19 9 millimeter semi-automatic

16   pistol with an obliterated serial number; six, two high

17   capacity magazines of ammunition; and $2,000 in cash, all of

18   which was seized during your arrest by law enforcement

19   officials on May 12th of 2020.

20         This court must also consider the sentencing

21   parameters set by the United States Sentencing Guidelines, the

22   guidelines for Section 18 U.S.C. 922(k) offenses and

23   Section 2K2.1.  Since the offense level involved a

24   semi-automatic firearm capable of accepting a large capacity

25   magazine, the base offense level is 20, pursuant to

1  Section 2k2.1(a) and its subparts, and according to

2  Section 2k2.1(b) and its subparts.

3  This offense is enhanced two levels if it involves

4  between three and seven firearms. Because your offense

5  involves three firearms, this two level enhancement applies.

6  Furthermore, according to Section 2K2.1(b)(4)(B), a four level

7  enhancement is warranted because you purchased two firearms

8  with obliterated serial numbers.

9  You have demonstrated acceptance of responsibility,

10 however, for your offense by entering a plea of guilty and

11 notifying the government in a timely manner of your intention

12 to plead guilty. Therefore, a three level reduction applies

13 under Section 3E1.1(b).

14 This calculation, sir, results in a total offense

15 level of 23.

16 The government, the defendant and Probation agree

17 with this calculation.

18 Is that true, government?

19 MR. McCONNELL: Yes, it is.

20 THE COURT: Is that true, Probation?

21 THE PROBATION OFFICER: Yes, Your Honor.

22 THE COURT: Is that true, defense counsel?

23 MR. SILVERMAN: Yes, Your Honor.

24 THE COURT: Thank you, sir.

25 The parties all agree that the defendant has a

8

1  criminal history category of I.  An adjusted offense level

2  calculation of 23 with a criminal history category of I yields

3  a guidelines imprisonment range of between 46 and 57 months.

4  I should note that pursuant to the plea agreement, the

5  defendant has waived his right to appeal any sentence of

6  60 months or below incarceration.

7          In addition, the guidelines further suggest a term

8  of supervised release of between one and three years and a

9  fine that the defendant can pay of between $20,000 and

10  $200,000.

11          Counsel, beginning with the government, am I missing

12  anything pertinent to today's proceedings?

13          MR. McCONNELL:  No.

14          THE COURT:  Defense counsel?

15          MR. SILVERMAN:  No, Your Honor.

16          THE COURT:  Are there any objections other than

17  those submitted in writing to the Court which the Court has

18  reviewed?

19          MR. McCONNELL:  No.

20          MR. SILVERMAN:  No, Your Honor.

21          THE COURT:  In that case, I will now turn it over to

22  defense counsel.  Please make your presentation and feel free

23  to remain seated and use the microphone, sir.

24          MR. SILVERMAN:  Thank you, Your Honor.

25          THE COURT:  Of course.

9

1        MR. SILVERMAN:  Your Honor, as I was preparing to
2   come today, I was thinking about when I first met Mr. Miner at
3   the beginning of the pandemic.  A friend told me a story that
4   she had gone to the doctor and the doctor was stunned because
5   she had no trouble breathing, she was young and healthy, but
6   the x-ray showed pneumonia and the doctor couldn't explain the
7   difference between the patient in front of her and what she
8   was seeing on the x-ray.  When I look at Mr. Miner's Instagram
9   posts, I am also baffled because they do not reflect the young
10  man who I have come to know over the past year and who I would
11  like to speak about for a few minutes.
12        Joseph is a son of Queens, a Mexican American
13  father, Italian American mother, both of whom are here today,
14  Patricia Miner and Michael Miner, and his fiancee Rachel Snow.
15  He grew up in America's most diverse county and one of its
16  most diverse neighborhoods in Bayside with all of the friends
17  and colleagues who you would expect.
18        He's someone who has had mental health challenges.
19  Notwithstanding those, he has remained consistently employed.
20  When he's lost jobs, he's gotten new jobs, and he has
21  maintained -- I think about, there are some baseball players
22  when they get sent down to triple A, they never come back up,
23  and there are some who really want to be in the majors and
24  they keep coming up and they keep coming up.  And Joseph
25  really wanted jobs and he consistently had jobs.

1        Joseph also picked up, and this is also common in

2   eastern Queens, racism, anti-Semitism, and at the risk of

3   saying something that we all know, you know, Joseph is here

4   today because he brought, he purchased illegal guns and not

5   because of what he would describe and acknowledge as far right

6   wing views.  I raise that because I think the government would

7   acknowledge, and the government will speak, but I think they

8   would acknowledge that Joseph caught the FBI's antenna because

9   of certain things that he said online that alarmed them.

10       I raise that because now he has been evaluated by a

11  forensic psychiatrist who the government selected, not a

12  defense chosen expert.  It is a government selected forensic

13  psychiatrist who met with Mr. Miner as many times as he wanted

14  for as long as he wanted, asked any questions he wanted and

15  reviewed whatever records he asked for, and he wrote a

16  comprehensive report.  Parts of it are tough but, overall, it

17  is fair and his bottom line conclusion is that Mr. Miner does

18  not pose a risk for terrorist violence.

19       That ranting online late at night, in Joseph's own

20  words, was the ranting of a lonely loser.  He was someone who

21  had lost his way and who was engaging in Instagram much like a

22  gambling addict engages in gambling, constantly looking for

23  that refresh, that thrill, needing another one, another one to

24  distract, and social media.  You get people's attention by

25  saying outrageous things and the incentives are to say more

1    and more outrageous things to get more likes, more follows,

2    more attention, and that was very addictive to a lonely

3    person.

4            Joseph knows that he's had mental health struggles

5    and when he was younger, he acknowledges that he was resistant

6    to pharmaceutical intervention.  He is now taking

7    pharmaceuticals and with very good effect.  When he was

8    younger, he tried a solely faith approach.  I don't want to

9    belittle that because faith is an extremely important part in

10   Joseph's life and will continue to be.  It will not be the

11   only way he addresses his mental health challenges going

12   forward.  It was a significant way he tried to address that in

13   the past.  He didn't deny he needed help.  He sought help

14   without pharmacology and now he realizes he needs the

15   pharmacology as well.

16           How did Joseph end up here.  Joseph wrote in his

17   diaries, his personal journals that the government provided to

18   me, for years.  He was looking, he had fairly mundane goals

19   for a young man.  He wanted to get more active in the church,

20   make some money, maybe join the military, maybe go for law

21   enforcement, buy some guns.

22           Joseph was moving around the country.  He was living

23   with his sister in Texas.  He had a job in Arizona.  He

24   attended a bible college in California.  These are places

25   where guns, even Texas and Arizona, even big guns are lawful

1    and normal parts of life.

2         Joseph approached the undercover agent about buying

3    guns while he still lived in New York.  It was reckless.  It

4    was illegal.  It would have been illegal for any guns as we

5    all know here in New York City, but I note and I wrote about

6    this in the letter, in the conversations that proceeded that,

7    the government's informant repeatedly asked what are you going

8    to do and suggested political and anti-Semitic and racist

9    violence and Joseph was clear that he's not interested in

10   that.  He was clear that he disavows that.  He wasn't saying

11   things that I would necessarily like to hear someone say,

12   saying that he doesn't like Jewish people, he was talking

13   about immigrants in ways that I wouldn't talk about, right,

14   but he was saying no, I'm not going to go attack people.

15        He was worried in April and May of 2020 that there

16   was going to be a breakdown in law and order and he wrote in

17   his journal he was going to leave a gun with his parents and

18   he was going to move with his fiancee in Virginia where she

19   lives and where guns are more lawful than they are here.

20        He agreed with the suggestion to purchase guns

21   without serial numbers and a silencer.  It was clearly

22   illegal.  It was clearly wrong.  It was his choice.  He was

23   not entrapped, he acknowledges that, but he was not seeking

24   out weapons of war.  He was -- in paragraph 10 of the PSR, it

25   describes the guns he went out to look for.  One was a

13

1   Mossberg 500.  It's a gun that one hunts birds with, one of

2   the best selling shotguns in the country, and the other was a

3   pistol.  He was suggested to buy an AR.  He chose to buy an

4   AR, he's responsible for buying the AR, but he was not going

5   out and looking for the kinds of weapons one would use in a

6   mass attack.  And even shortly after he bought other items

7   like body armor --

8            THE COURT:  I just want to be clear.  You're telling

9   the Court that ARs are not weapons used in mass attacks?

10           MR. SILVERMAN:  No, Your Honor.  Thank you for

11  allowing me to clarify.

12           Joseph first approached the informant about

13  purchasing five guns, two for himself, a Mossberg and a

14  pistol, and then the undercover suggested other guns and

15  Joseph ended up deciding to buy other guns.  So my only point

16  was when he first went out to buy guns, the guns that he was

17  initially looking for were a Mossberg 500 and a pistol, not an

18  AR, but he definitely agreed to buy an AR.

19           THE COURT:  And he did buy an AR.

20           MR. SILVERMAN:  And he did buy an AR.

21           THE COURT:  And that is a weapon that's used in mass

22  shootings, isn't it?

23           MR. SILVERMAN:  It sure could be, Your Honor.

24           THE COURT:  It has been, hasn't it?

25           MR. SILVERMAN:  I believe that's so.

14

1       THE COURT:  You believe it's so?

2       MR. SILVERMAN:  I'm being cautious as a lawyer

3  because I don't know exactly but I believe it's very, very

4  likely.

5       THE COURT:  You don't know whether ARs have been

6  used in mass shootings in the United States of America within

7  the last year?  Is that what you're telling the Court as an

8  officer of this court?

9       I just want to know whether you are telling this

10  court that you are unaware that AR-15s have been used in mass

11  shootings in the United States of America in the last year.

12  Is that what you're telling me?  You can tell me that if

13  that's what your understanding is.

14       MR. SILVERMAN:  No, Your Honor.

15       THE COURT:  You do understand that AR-15s have been

16  used in mass shootings in this country, do you understand

17  that?

18       MR. SILVERMAN:  I believe so.

19       THE COURT:  You believe it's so or you know it's

20  so?

21       MR. SILVERMAN:  I, I, I accept Your Honor's --

22       THE COURT:  I'm asking you a question about your

23  knowledge, as an officer of the Court, whether you know that

24  AR-15s have been used in mass shootings in the United States

25  of America.  If you don't know, you can tell me that.

15

1      MR. SILVERMAN:  I don't have specific knowledge.

2      THE COURT:  Do you have general knowledge that

3  AR-15s have been used in mass shootings in this country

4  including places like grammar schools in Connecticut?  Do you

5  not understand that?  Do you not know that?

6      MR. SILVERMAN:  I have general knowledge, yes,

7  Your Honor.

8      THE COURT:  Do you have specific knowledge of it?

9  What do you mean, general knowledge?  Do you know or don't you

10  know?

11      MR. SILVERMAN:  I think -- I don't -- I haven't

12  followed the specifics of the kinds of weapons in these cases

13  but I think that that's right.

14      THE COURT:  Go on.

15      MR. SILVERMAN:  And he bought the guns and he

16  acknowledges he bought the guns and it was wrong.

17      I would just say in summation, Your Honor, Joseph, I

18  know from talking to him, is quite ashamed of things that he's

19  written.

20      He is getting medication that he needs.  The

21  forensic psychiatrist assesses him the way I, as an amateur,

22  I'm a lawyer, not a psychiatrist, but as I have seen him which

23  is not someone who would commit violence, someone who runs his

24  mouth, someone who rants late at night but who in his daily

25  dealings in every day life works with Jewish people, works

1  with immigrants, works with African-Americans and is a

2  productive member of our diverse society and has demonstrated

3  with his actions that that's what he is and I believe that

4  Dr. Katsavdakis' report is exactly right.

5          In addition, the parties, we understand that the

6  supervised release terms are the Court's to determine.  They

7  are proposed in the plea agreement and any terms like those

8  are far more stringent than ordinary and would provide an

9  extra layer of protection but the Joseph who I know, the

10 Joseph who his family knows and the Joseph who the

11 government's chosen forensic psychiatrist saw is not a

12 dangerous person.  He's someone who made a terribly boneheaded

13 decision but who is not someone who harms people.

14         Unless the Court has any questions, Mr. Miner I know

15 would like to address the Court if this is the right time.

16         THE COURT:  Yes.  Mr. Miner, you may address the

17 Court now.

18         THE DEFENDANT:  Thank you, Your Honor.

19         Your Honor, I would just like to say that the

20 appalling nature of some of my social media discourse is

21 self-evident.  It really goes without saying.

22         I completely understand how certain of the

23 statements that I made would and indeed did trigger a federal

24 investigation and intervention into my life.  I take full

25 responsibility for the consequences of employing this kind of

1   rhetoric and I also accept responsibility for my reckless,

2   foolhardy and criminal decision to purchase firearms

3   illicitly.

4           My actions have brought great shame and trouble to

5   not only myself but to my family, my loved ones and my

6   co-defendant as well for being associated with me.  I deeply

7   regret this blunder which is, by far, the worst and most

8   serious of my life and I have certainly been known to make a

9   blunder or two.

10           That being said, while I sit before you today, I

11   would like to most emphatically state that I am not a

12   terrorist.  It is simply not in my heart to go out into the

13   world and commit an atrocity.  I'm aware that some of my

14   statements would seem to contradict that but I know my heart

15   and what I am capable and not capable of doing.

16           Since my teenage years, I have battled with

17   maintaining my mental health and this is something I may have

18   to battle with for the rest of my life.  This along with

19   personal grievances I've experienced and certain cultural

20   struggles that have been manifested openly in our nation over

21   recent years worked together to lead me to the point that I

22   came to.

23           I know that Your Honor has likely heard all sorts of

24   excuses and reasons for one's criminal conduct in other cases

25   in the past.  I do not excuse my criminal act.  I'm simply

1   stating the truth even as it is supplemented by official

2   investigative work in regards to my case.

3          I would also like to freely admit that I am rather

4   eccentric in my personality and interests which although this

5   is, of course, not punishable by law, perhaps it's exacerbated

6   the scrutiny that I've come under.

7          Your Honor, my time of incarceration at the

8   Metropolitan Detention Center has been life changing.  Though

9   it's been particularly difficult due to extensive coronavirus

10  related precautions, it has been a time of serious reflection

11  and renewal.  It goes without saying how much I regret my

12  crime.  I was filled with regret, not to mention shock, but I

13  was filled with regret the instant of my arrest and I continue

14  to regret it and although I continue to have to work through

15  residual bitterness over my situation, bitterness which I have

16  expressed, I'm fully confident I will come through on the

17  other side of this ordeal a far better man.  Growth and

18  maturity is a process and wisdom is often hard learned.

19         I gladly accept the conditions imposed upon my

20  release by the government.  I understand and accept that I

21  will receive the help I need and keep myself accountable to

22  the proper authorities.  We have a comprehensive plan in place

23  which I am committed to abiding by.

24         On another note, I also have the most beautiful

25  goals I've ever had in my life with my fiancee Rachel who sits

1   right here next to my parents.  Namely, we plan to marry and

2   to start a family which will fulfill my purpose and keep me on

3   the right track.  My goal in the future awaits me just outside

4   these walls.  I'm not jumping back into the world without a

5   plan for success and set goals in mind.

6          The young man I was prior to my arrest is not the

7   man I will be for the rest of my life, Judge Kuntz.  This was

8   all merely a chapter of my life and I refuse to let it define

9   my whole story.  Your Honor, I'm ready to accept whatever

10  sentence that the Court deems best and although, like any

11  other prisoner, I hope for some mercy in my case, I completely

12  accept the consequences of my decisions whatever they may be.

13         Thank you for your time, Your Honor.

14         THE COURT:  Thank you, Mr. Miner.

15         I'll hear from the government and then from

16  Probation if you wish to be heard.

17         MR. McCONNELL:  Thank you, Your Honor.

18         I think we all want to believe everything that we

19  just heard from the defendant and Mr. Silverman and I should

20  say, at the outset, I, by and large, take at face value the

21  majority of what was just said.  I also had the opportunity to

22  meet Mr. Miner prior to today.  He presented much as he just

23  did before the Court, as a very smart, well-spoken man.  He

24  was blessed with many gifts including a supportive family.

25         So there is certainly some powerful mitigation that

1   Your Honor needs to consider when fashioning a sentence, but I

2   don't think it's mitigation that warrants a sentence that

3   Mr. Silverman is asking for.  The government is recommending a

4   sentence at or near the top of the guidelines.  I'm not going

5   to repeat everything that we put in our sentencing memo, but

6   based on the arguments here today, I think it's important to

7   highlight a few points.

8            First, to be clear, this is not about Mr. Miner's

9   opinions, it's not about his politics, it's about what he did

10  and the things that he was saying went far beyond political

11  hyperbole or bigoted views or anything like that.  He has the

12  absolute right to hold and express those opinions but that's

13  not what he was doing leading up to his arrest.  He was

14  espousing and glorifying violence.  Violence has no politics.

15  It has no ideology.  He was talking about committing acts of

16  violence himself and I want to say in open court, it would

17  have been an abdication of law enforcement's responsibility to

18  let that go unnoticed and uninvestigated.

19           So that's sort of the starting point here.  So let's

20  talk about what he did.

21           Prior to him reaching out to the undercover officer

22  in this case -- not the other way around, he reached out to

23  the undercover -- prior to that, Mr. Miner had already

24  purchased a bulletproof vest with a Nazi emblem on the chest,

25  he had purchased a tactical helmet like one would wear on the

1  battlefield and had made inquiries at a pawn shop about buying

2  various weapons including an AR-15.  That is all prior to any

3  involvement from the undercover in this case.

4          After he reached out to the undercover, he was not

5  pushed into doing anything that he did not want to do.  This

6  is not someone who was tricked or deceived into doing

7  something out of character or ensnared in some sort of

8  government sting.  He reached out to the undercover and when

9  presented with the opportunity to buy this arsenal of weapons,

10  he didn't hesitate.

11          You know, it's hard to know what's in someone's

12  heart and we'll never know what Mr. Miner would have done if

13  left to his own devices but, you know, given every indication

14  that law enforcement was privy to, it was quite clear that he

15  was planning something potentially terrible.  He was a time

16  bomb waiting to go off.  He expressed that himself to other

17  people in his communications.  And, you know, he was following

18  down a path that people before him have followed where the end

19  results are acts of horrific violence.

20          That's not to say that at times, he did not, you

21  know, disavow violence or lone wolf tactics.  He did not seek

22  to affiliate himself with any particular group.  That is all

23  true but for every disavowal, there was some other

24  communication where he expressed a hateful, violent statement

25  that indicated, you know, the exact opposite.  So it's very,

1   very tough to sort of parse the things that he said

2   historically.

3         You know, there were times when he was talking about

4   things where he would cut off the conversation about weapons

5   or violence because he was on an open line with the person

6   that he was talking to and suggested that they move to

7   encrypted communications.  So we just don't know what he would

8   have done if left to his own devices and, frankly, I think

9   we're all happy that we didn't find out particularly with what

10  was going on in this city and around the country shortly after

11  he was arrested.

12        That's really the challenge before the Court when

13  fashioning the sentence, what is he going to do when he's left

14  to his own devices, when he's not incarcerated, when he's not

15  under supervision of the Bureau of Prisons and told when to

16  lock in every night.  Your Honor can impose jail.  Your Honor

17  can impose the strict conditions of release.  They're

18  certainly appropriate.  We agree to those.  The defendant

19  agreed to those.  Your Honor can impose a rigorous plan of

20  psychiatric treatment but it really comes down to him and his

21  ability or willingness to follow treatment plans in the past

22  is not particularly promising and that's a real concern.

23        I think we all hope for the best and we wish him the

24  best and we think that this experience hopefully has been

25  humbling and hopefully has changed him in the way that he has

23

1    just described, but the reality is when you look at this

2    offense conduct and you look at his history and

3    characteristics and you consider all of the 3553(a) factors,

4    it's the government's position that a sentence at or near the

5    top of the guidelines is the only appropriate one and we ask

6    that Your Honor so find.

7              Thank you.

8              THE COURT:  Thank you, Counsel.

9              I will hear from Probation if you wish to make a

10   estimate, sir.

11             THE PROBATION OFFICER:  Nothing to add other than

12   what's in the recommendation, Your Honor.

13             THE COURT:  Thank you, sir.

14             The Court has this to say.  Mr. Miner, perfect

15   justice in your case would involve a power that neither I nor

16   any judge nor any human being for that matter has in his or

17   her hands.  It is challenging and humbling for me to sit here

18   as the court and to pass sentence on a fellow human being.

19             This case impacts your family and the Court notes

20   with pride their presence and support and urges they continue

21   to be supportive to you throughout your life.  This case

22   impacts the victims of your crime.  Ultimately, of course,

23   this case impacts you because this case is ultimately about

24   you, about what you did, not what you believed, but what you

25   did that brought us here today, a day of sadness and a day of

1    tragedy.

2              On May 13th of 2020, the United States of America

3    filed a criminal complaint against Joseph Miner, the defendant

4    in this case.  That complaint alleged one count of possession

5    of a defaced firearm in violation of Title 18, United States

6    Code, Section 922(k).  On January 22nd of 2021, the defendant

7    waived indictment and pled guilty to a criminal information

8    charging him with the same count of possession of a defaced

9    firearm.

10              The Court hereby sentences this defendant and sets

11   forth its reasons for the defendant's sentence using the

12   rubric of the 18 U.S.C. Section 3553(a) factors pursuant to 18

13   U.S.C. Section 3553(c)(2).  I begin with the legal standard.

14              Title 18 of the United States Code, Section 3553

15   outlines the procedures for imposing sentence in a criminal

16   case.

17              The starting point and initial benchmark in

18   evaluating a criminal sentence is the guidelines sentencing

19   range pursuant to Gall versus United States, 552 U.S. 38, 49,

20   decided in 2007.

21              If and when a District Court chooses to impose a

22   sentence outside the sentencing guidelines range, the court

23   shall state in open court the reasons for its imposition of

24   the particular sentence and the specific reason for the

25   imposition of a sentence different from that described in the

1  guidelines.  The court must state with specificity its reasons

2  for so departing in a statement of reason form.

3         The sentencing court's written statement of reasons

4  shall be a simple fact specific statement explaining why the

5  guidelines range did not account for a specific factor or

6  factors under Section 3553(a) decided by my recently departed

7  brother Judge, Jack Weinstein, a member of the greatest

8  generation, in United States versus Davis, 8-CR-332, 2010,

9  Westlaw 1221709 at star 1, decided by my late brother

10  Judge Weinstein on March 29th of 2010.

11         Section 3553(a) provides a set of seven factors for

12  this court to consider in determining what sentence to impose

13  on a criminal defendant.  This court now addresses each in

14  turn.  The analysis begins considering the nature and

15  circumstances of the offense and the history and

16  characteristics of the defendant.

17         The first 3553(a) factor requires this court to

18  evaluate the nature and circumstances of the offense and the

19  history and characteristics of the defendant.  18 U.S.C.

20  Section 3553(a)(1).  Family and personal background are

21  addressed.

22         The defendant was born and raised in an intact

23  family setting with a twin brother and his parents, the latter

24  of which continue to live and work in Queens.  His brother

25  resides in Denton, Texas and is currently facing prosecution

1  for two counts for witness tampering in the Eastern District

2  of Texas.  Additionally, the defendant has four paternal half

3  siblings.  The defendant reported an unremarkable childhood

4  free from any abuse.  The defendant himself is not yet married

5  or fathered any children, but has a good relationship with his

6  fiancee who is here today and the Court acknowledges her

7  presence and support.

8          The defendant is in good physical health but

9  experiences feelings of depression which began as a teenager

10 and was diagnosed with manic depression and bipolar disorder

11 when he was some 20 years old which is to say ten years ago.

12 Additionally, the defendant received counseling at Pride of

13 Judea in Queens for one year and took prescription medication

14 to treat that depression and bipolar disorder, however, in

15 2012, he decided he would cease the medical treatment and he

16 opted instead to rely on spiritual counseling and prayer alone

17 to manage his symptoms.  The defendant has recently begun

18 taking a common atypical antipsychotic medication and defense

19 counsel notes and has noted here today that the defendant has

20 recommitted to psychiatric medication and the Court commends

21 the defendant for doing so.

22         The defendant has a history of substance abuse.  He

23 reported regular use of marijuana for several years until his

24 arrest, intermittent cocaine use and the use of hallucinogens

25 such as mushrooms and Salvia.  Additionally, the defendant has

1 a history of binge drinking beginning in college until this

2 offense and was arrested and charged with driving while

3 intoxicated.  In 2014, the defendant completed a nine or ten

4 month inpatient drug treatment program in Illinois and

5 requested additional drug treatment counseling during his

6 present incarceration.

7         The defendant's highest levels of education

8 attainment included attending Queens College for two years and

9 earning a one year Bible certificate from West Coast Baptist

10 College in California.  He previously graduated from the

11 Benjamin Cardozo High School in Queens.  The defendant most

12 recently worked as a counterperson in a delicatessen but has

13 also held jobs as canvasser, real estate salesman, a

14 chauffeur, roofer, helper, driver, cleaner and laborer for

15 seven different employers over a five year period.  The

16 defendant failed to file income tax returns in 2017, 2018 and

17 2019.

18         Addressing the defendant's history of racist and

19 anti-Semitic behavior, since at least 2019, the defendant has

20 publicly engaged in certain behavior including posting the

21 following statements on his social media.

22         A photograph of himself giving a Nazi salute and

23 writing:  "God, I hate women, Jews and niggers."

24         He posted a photograph of himself giving a Nazi

25 salute displaying a large knife and writing:  "Overthrow Jews,

1    overthrowing Jews is our Christian duty."

2             In response to a bloody crime scene photograph from

3    the December 2019 machete attacks as a synagogue, a house of

4    prayer in Monsey, New York, he wrote the comment, and I quote:

5    "Not gonna lie, this is pretty fucking exciting."

6             In response to a post lamenting the recent spate of

7    anti-Semitic attacks in greater New York City, he wrote:

8    "Heil Hitler," but he misspelled "Heil."

9             He posted a photograph of a Planned Parenthood

10   office being blown up by the comic book villain the Joker.

11            And he posted an article describing his arrest,

12   describing the arrest of 26-year old Israeli national for

13   cashing a false check with his written post that:  "Jews must

14   have a genetic devotion to the number 6.  666, 6 million, et

15   cetera."

16            This defendant further glorified and fantasized

17   about mass shooting attacks.  He wrote and posted about

18   "martyring" himself and "going out in a blaze of glory" and

19   publicly considered "going out firing, going on a spree after

20   my enemy until the authorities take me out.  Sometimes I've

21   considered forming a well trained INCEL hit squad."

22            In another series of posts on January 3, 2020, this

23   defendant wrote:  "I want to go out shooting the cops cost.

24   Take out a bunch of enemies and die shooting."

25            In a post on February 14, 2020, this defendant

1  wrote:  "To be honest, dying fighting Paki and African pieces

2  of shit in Europe wouldn't be the worst way to go, die a

3  hero."

4          Now, this defendant attempted to acquire serious

5  weaponry to further his White Nationalist and White

6  Supremacist ambitions.  In November of 2019, he posted about

7  acquiring weapons for "Boogaloo" purposes.  Boogaloo is a well

8  known slang for racial civil war in the United States.  And

9  this defendant later discussed his hopes for the onset of

10  RaHoWa, R-A-H-O-W-A, or a racial holy war.  While

11  contemplating a move to Texas, where he wrote, a man can "own

12  his guns" without having to "beg police, judge and detective

13  for permission just for a pistol.  Beg on your knees like a

14  bitch."

15          And yet another November 2019 post in an apparent

16  reference to the 2017 White Supremacist rally in

17  Charlottesville, Virginia which killed a young woman who was

18  peacefully there, he wrote, "I am pretty serious at this

19  point.  I yearn for the next C-ville."

20          While in some statements, this defendant, as his

21  counsel pointed out, attempted to play down his propensity for

22  violence, for instance, by claiming that he needed these

23  weapons for self-defense and while claiming he was "so tame,

24  he's no real threat."  He at other times wrote:  "Some day, I

25  will probably have to shed my blood or go to prison for the

1   things I do and stand for."

2          Even more importantly, this defendant sought time

3   and again to obtain tactical military gear and firearms

4   leading up to the instant offense.

5          In January of 2020, this defendant purchased body

6   armor as we've heard from the government emblazoned with the

7   iteration of the Wolfsangel, a Nazi party symbol that most

8   recently has been adopted by Azov Battalion, a Ukrainian

9   militia group.

10          In February 2020, this defendant called upon a shop

11   as we heard in Texas and inquired about purchasing assault

12   weapons as well as purchasing a Mossberg shotgun.  On

13   March 30th of 2020, this defendant purchased a tactical

14   ballistic helmet as we heard and he posted a photo of it on

15   Instagram.

16          On April 20, 2020, this defendant began

17   communications with, unknown to him, an undercover officer

18   seeking to buy two firearms, a Smith and Wesson Shield M2.0

19   9 millimeter pistol and a Mossberg 500 shotgun, along with

20   ammunition.  This defendant expressed interest in buying an

21   assault rifle when he had more money in the future.  This

22   defendant suggested to the undercover officer that further

23   communications occur over encrypted messaging platforms and

24   expressed interest in acquiring defaced weapons, i.e., weapons

25   without serial numbers or other identifying marks.

1        On April 27th of 2020, this defendant contacted the

2  undercover officer via the encrypted messaging platform and

3  confirmed he wished to purchase the firearms they had

4  previously discussed.  This defendant told the undercover

5  officer to, quote, unquote, "bring the Shield 9 millimeter

6  pistol, the Mossy, the shotgun and that ghost with attachment,

7  the AR-15 with silencer, you mentioned, and maybe a few boxes

8  of ammunition beside.

9        This defendant also asked the undercover officer for

10  additional firearms, referring to a KelTec P382 semi-automatic

11  pistol.  The undercover officer again informed this defendant

12  via text:  The serial numbers are all cleaned off so they're

13  clear, no trace and good to go.  I will have the ghost AR and

14  come with some other long guns for you guys."

15        On May 12th of 2020, this defendant met two

16  undercover officers at a hotel in Queens, New York to

17  consummate the transaction.  There, this defendant purchased

18  the AR-15 style ghost gun with a silencer, a Mossberg 500

19  shotgun with an obliterated serial number and an M&P Shield

20  9 millimeter semi-automatic pistol with an obliterated serial

21  number.  Then the defendant was arrested on the same day and

22  has been in custody ever since.

23        The second 3553(a) factor instructs this court to

24  consider the need for the sentence imposed to reflect the

25  seriousness of the offense, to promote respect for the law and

1    to provide just punishment for the offense, to provide and to

2    afford adequate deterrence to criminal conduct, to protect the

3    public from further crimes of the defendant and to provide the

4    defendant with needed educational or vocational training,

5    medical care or other correctional treatment in the most

6    effective manner.

7            The instant sentence adequately punishes this

8    defendant for his crimes and provides both general and

9    specific deterrence.  Furthermore, a period of incarceration

10   will protect the public from the defendant's inclination

11   toward violence, racist and anti-Semitic behavior.  Through

12   both incarceration and a period of supervised release, this

13   defendant will have an opportunity to rehabilitate and

14   reintegrate into society.

15           The third 3553(a) factor requires the Court to

16   detail the kind of sentence available for the defendant.

17           On January 22nd, as I previously stated, of 2021,

18   the defendant waived indictment and pled guilty to a criminal

19   information charging him with possession of a defaced firearm

20   in violation of 18 U.S.C. Section 922(k).

21           The defendant faces, as I stated before, and as the

22   parties have all agreed, a maximum term of five years

23   imprisonment, that is to say 60 months.  Additionally, the

24   Court may impose a term of supervised lease not to exceed

25   three years, a maximum fine of $250,000, a mandatory special

1    assessment of $100.  The defendant may be required to pay the

2    cost of prosecution.  And the Court may order restitution to

3    be paid to any victim of the offense under 18 U.S.C.

4    Section 3663(a)(1)(A).

5             The fourth 3553(a) factor requires the Court to

6    discuss the kinds of sentence and the sentencing range

7    established for the applicable category of offense committed

8    by the applicable category applicable to this defendant as set

9    forth in the guidelines.

10            As you've heard from all the parties, the guidelines

11   recommend a sentence of between 46 and 57 months of custody.

12   The guidelines for 18 U.S.C. Section 922(k) offenses,

13   Section 2K2.1.  Since the offense involved a semi-automatic

14   firearm capable of accepting a large capacity magazine, the

15   base offense level is 20.  U.S.S.G.

16   Section 2K2.1(a)(4)(B)(ii).

17            The offense is enhanced by two levels if it involves

18   between three and seven firearms pursuant to U.S.S.G.

19   Section 2K2.1(b)(1)(A).  Because, as stated, the instant

20   offense involves three firearms, this two level enhancement

21   applies.  Furthermore, a four level enhancement is warranted

22   because the defendant purchased two firearms with obliterated

23   serial numbers pursuant to U.S.S.G. Section 2K2.1 (b)(4)(B).

24            The defendant has, as previously noted, accepted

25   responsibility for his offenses by entering a plea of guilty

1    and notifying the government in a timely fashion of his

2    intention to pled guilty.  Therefore, a three level reduction

3    applies pursuant to U.S.S.G. Section 3E1.1(a) through (b).

4           This calculation results in the total offense level

5    of 23 and as previously stated and confirmed in court, the

6    parties all agree this calculation is accurate and further

7    agrees the defendant has a criminal history category of I.

8    The adjusted offense level calculation is 23 and, with a

9    criminal history category of one, yields a guideline

10   imprisonment range of 46 to 57 months.

11          We address the parties' recommendation which you

12   heard in open court today.  The parties provided divergent

13   recommendations to this court based upon the guideline

14   sentencing range.  Defense counsel recommends a below

15   guideline sentence of 30 months in prison emphasizing the

16   defendant's willingness to engage in proper medical treatment.

17   Probation recommends a sentence of 57 months of imprisonment

18   which is at the top of the guidelines range.  The government

19   recommends a sentence at or near the top of the guidelines

20   range.

21          Furthermore, as outlined in paragraph 6 of the plea

22   agreement and as you've heard today, this defendant consents

23   to the forfeiture of the following, the AR-15 style assault

24   weapon and silencer, the Mossberg 500 shotgun with obliterated

25   serial number, the MP Shield 9 millimeter semi-automatic

1   pistol with obliterated serial number, fully automatic Colt

2   M-467 assault rifle and silencer, Glock Model 199 millimeter

3   semi-automatic pistol with obliterated serial number, two high

4   capacity magazines and ammunition and $2,000 in cash, all of

5   which was seized as previously noted on May 12, 2020.

6        The fifth 3553(a) factor requires this court to

7   evaluate any pertinent policy statement issued by the

8   Sentencing Commission under 18 U.S.C. 3553(a)(5).  The Court

9   finds that's not pertinent to the defendant's sentencing here

10   today.

11        The sixth 3553(a) factor requires this court to

12   consider the need to avoid unwarranted sentence disparities

13   among defendants with similar records who have been found

14   guilty of similar conduct, 18 U.S.C. Section 3553(a)(6).  For

15   the reasons stated in this memorandum and order and

16   considering the other six 3553(a) factors, this court's

17   sentence avoids unwarranted sentence disparities.

18        Lastly, the seventh 3553(a) factor requires this

19   court to touch upon the need to provide restitution to any

20   victims of the offense.  This factor is not relevant to the

21   defendant's sentence.

22        So finally, Mr. Miner, the Court has this to say to

23   you as it pronounced its sentence.

24        The great American poet Maya Angelou captured the

25   essence of your case when she wrote:  When someone shows you

1    who they are, believe them.

2         You have shown this court not only who you are, but

3    more importantly what you are:  A racist, anti-Semitic,

4    misogynistic, gun buying criminal, a man whose actions but for

5    the skill and dangerous intervention by law enforcement

6    officers who put their lives on the line presented a clear and

7    present danger to the American Republic.

8         Like the author of "Mein Kampf" who you purport to

9    admire, you have revealed yourself to be a full-blown Nazi and

10   trust me, this judge does not need to see the second edition

11   of "Mein Kampf" pursued here in the Eastern District of

12   New York where my hero fellow Judges Jack Weinstein, Ira

13   Glasser, Hurley and Platt fought as members of the greatest

14   generation to defeat the Nazis, not in my court, not on my

15   watch, not in my country, never again.

16        The Court hereby sentences you to 57 months of

17   incarceration to be followed by three months of supervised

18   release.  Now also I am imposing a $100 special assessment

19   which is appropriate and which comports with the dictates of

20   3553 and I'm required to impose that per count in every case.

21   This sentence is consistent with and is sufficient but no

22   greater than that necessary to accomplish the purposes of

23   3553(a)(2).

24        As a condition of supervised release, this court

25   adopts the special conditions as well as the regular

37

1    conditions of probation and now directs the Probation

2    Department to read those conditions slowly and carefully into

3    the record.  The Court adopts them subject to any errors of

4    law contained therein.

5              Please read them now, sir.

6              THE PROBATION OFFICER:  Your Honor, just a quick

7    question.

8              THE COURT:  Keep your voice up with your quick

9    question and use the mic.

10             THE PROBATION OFFICER:  Yes, sir.  Are you also

11   adopting the conditions in the plea agreement?

12             THE COURT:  Yes, as agreed to and as I stated

13   earlier.  Yes, those are adopted as well.  Go ahead.

14             THE PROBATION OFFICER:  The defendant shall

15   undergo --

16             THE COURT:  I'm going to ask you to channel your

17   inner Lord Vader speech patterns and slow it down, not your

18   inner Chris Rock, Woody Allen.  Go ahead.

19             THE PROBATION OFFICER:  Yes, Your Honor.

20             The defendant shall undergo a substance abuse

21   evaluation and if deemed necessary, participate in an

22   outpatient drug treatment program approved by the United

23   States Probation Department.  The defendant shall contribute

24   to the cost of such treatment, not to exceed an amount

25   determined reasonable by the Probation Department's sliding

1  scale for substance abuse treatment services and shall

2  cooperate in securing any applicable third-party payment such

3  as insurance or Medicaid.  The defendant shall disclose all

4  financial information and documents to the Probation

5  Department to assess his ability to pay.

6          The defendant shall not consume any alcohol or other

7  intoxicants during and after treatment unless granted a

8  prescription by a licensed physician and proof of same is

9  provided to the Probation Department.  The defendant shall

10  submit to testing during and after treatment to ensure

11  abstinence from drugs and alcohol.

12          The defendant shall report to the Probation Office

13  any and all electronic communications, service accounts as

14  defined in 18 U.S.C. 2510(15), used for use of communications,

15  dissemination and/or storage of digital media files, example,

16  audio video images.  This includes but is not limited to

17  e-mail accounts, social media accounts and cloud storage

18  accounts.

19          The defendant shall provide each account identifier

20  and password and shall report the creation of new accounts,

21  changes in identifiers and/or passwords, transfer, suspension

22  and/or deletion of any account within five days of such

23  action.  Failure to provide accurate account information may

24  be grounds for revocation of release.  The defendant shall

25  permit the Probation Office to assess and search for any

1   account using the defendant's credentials pursuant to this

2   condition only when reasonable suspicion exists that defendant

3   has violated a condition of his supervision and that accounts

4   to be searched contains evidence of this violation.  Failure

5   to submit to such a search may be grounds for revocation of

6   release.

7           The defendant shall cooperate with the Probation

8   Department's computer and internet monitoring program.

9   Cooperation shall include but not be limited to identifying

10  computer systems, internet capable devices and/or similar

11  electronic devices the defendant has access to and allowing

12  the installation of monitoring software hardware on said

13  devices at the defendant's expense.  The defendant may be

14  limited to possessing only one personal internet capable

15  device to facilitate our department's ability to effectively

16  monitor his internet related activities.  The defendant shall

17  also permit random examinations of said computer systems,

18  internet capable devices and similar electronic devices and

19  related communication -- I'm sorry -- and related computer

20  peripheral such as CDs under his control.

21          The defendant shall not associate in person, through

22  mail, electronic mail, the internet, social media, telephone

23  or any other means with any individual with an affiliation to

24  an organized crime group, gangs or any other criminal

25  enterprise nor shall the defendant frequent any establishment

1  and/or locale where these groups may meet pursuant but not

2  limited to a prohibited list provided by the Probation

3  Department.

4        There is also a search condition.  The model search

5  condition is recommended which in this case, the defendant

6  shall submit his person, property, house, residence, vehicle,

7  papers, computers, other electronic communications or data

8  storage devices or media or office to a search conducted by a

9  United States Probation Officer.  Failure to submit to a

10  search may be grounds for revocation of release.  The

11  defendant shall warn any other occupants that the premises may

12  be subject to searches pursuant to this condition.  An officer

13  may conduct a search pursuant to this condition only when

14  reasonable suspicion exists that the defendant has violated a

15  condition of his supervision and that the areas to be searched

16  contain evidence of this violation.  Any search must be

17  conducted at a reasonable time and in a reasonable manner.

18        Defendant also agrees to participate in polygraph

19  examinations required by the Probation Department to obtain

20  information necessary for risk management and correction.

21        The defendant also agrees to abstain from creation

22  and of use of social media accounts for a period of six months

23  upon release.

24        Finally, the defendant agrees to location monitoring

25  for a period of 12 months.

1          Your Honor, the Probation Department has a request

2     with respect to the location monitoring for twelve months.

3     Such a long period is a burdensome to the Probation

4     Department.

5               THE COURT:  Deal with it.

6               THE PROBATION OFFICER:  Yes, Your Honor.

7               THE COURT:  Deal with it.

8               Anything else from Probation?

9               THE PROBATION OFFICER:  No, Your Honor.

10              THE COURT:  Anything else from the government?

11              MR. McCONNELL:  No, Your Honor.

12              THE COURT:  Anything else from defense counsel?

13              MR. SILVERMAN:  Yes, Your Honor.

14              We respectfully request that the Court recommend to

15     BOP that it designate Mr. Miner to serve his sentence in

16     northern Virginia or near there.  That's where his fiancee

17     lives and where he plans to live upon his release.

18              THE COURT:  Any objection?

19              MR. McCONNELL:  No.

20              THE COURT:  I will make that recommendation in the

21     judgment to the BOP.

22              MR. SILVERMAN:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24              Anything else, Counsel?

25              MR. SILVERMAN:  No, that's it.  Thank you,

42

1    Your Honor.

2             THE COURT:  Anything else from you, Mr. Miner?

3             THE DEFENDANT:  Nothing I should say in court.

4             MR. SILVERMAN:  Thank you, Your Honor.

5             THE COURT:  Nothing you should say in court?

6    Anything you want to say?  Feel free to say it.

7             MR. SILVERMAN:  Your Honor --

8             THE COURT:  Anything else you want to say,

9    Mr. Miner?

10            THE DEFENDANT:  God bless you.

11            THE COURT:  Yes.  God bless you.

12            We are adjourned.

13            (Matter concluded.)

14

15

16

17

18                    *     *     *     *     *

19

20

21   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
22

23       /s/ Charleane M. Heading              September 12, 2013
     _____    _____
24       CHARLEANE M. HEADING                    DATE

25

CMH      OCR      RMR      CRR      FCRR